IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

BP PRODUCTS
NORTH AMERICA INC.,

        Plaintiff,

v.                                       Civil Case No. 3:13-cv-718-JAG

SOUTHSIDE OIL, L.L.C. and
SUNOCO, INC.,

        Defendants.

## Memorandum Opinion

This matter comes before the Court on the plaintiff's Motion for a Preliminary Injunction. (Dk. No. 4.) The plaintiff, BP Products North America, Inc. ("BP"), filed this contract case against the defendants, Southside Oil, LLC, and Sunoco, Inc. ("Southside" and "Sunoco"), on October 22, 2013. The complaint alleges that the defendants, in executing a 2013 contract pertaining to fuel-rights and station branding, colluded to deny BP its contractual Right of First Offer ("ROFO") and Right of First Refusal ("ROFR") arising from a 2010 contract between BP and Southside.

In its motion, BP seeks to prevent the defendants from changing any more stations from the BP brand to Sunoco. While establishing that Southside and Sunoco acted in an underhanded fashion, BP has not shown that it is clearly likely to prevail on the merits, that denial of its motion would cause it irreparable harm, that the equities favor granting an injunction, or that the public interest favors granting interim equitable relief. The Court therefore DENIES the plaintiff's motion.

## I. Statement of Material Facts

In 2005, BP sold many of its Virginia gas stations to Southside, a corporation that both owns its own gas stations and has fuel-supply agreements with other, independent gas stations. The sale formed part of a larger strategic plan in which BP decided to stop owning stations and began simply to sell gas to BP branded stations through middlemen. Southside owned a number of BP stations, and supplied gasoline to other BP stations. In the 2005 agreement, Southside agreed to continue to market BP products at BP's former stations. The parties renewed that 2005 contract in a 2010 document known as a Branded Jobber Contract (the 2010 "BJC").[1]

The 2010 BJC (and a 2010 "side letter") provided, *inter alia*, that BP would enjoy a Right of First Offer as to any proposed sale or transfer of Southside assets to another entity. Pursuant to this term of the contract, before Southside sold any BP stations, or changed any BP stations to other brands, it had to provide a term sheet outlining its goals in the sale. BP could then either negotiate with Southside, or simply allow Southside to negotiate with other buyers and fuel suppliers. In either event, the Right of First Offer did not require Southside to accept BP's offer to buy any of its assets.

The agreements also contained a Right of First Refusal[2] in the event that Southside decided to sell or transfer control of its *entire* petroleum business. This provision required Southside to give BP written documentation detailing the proposed sale, so that BP could decide whether to buy the entire business.

---

[1] A petroleum "jobber" purchases fuel from a refiner and resells it to a gas station. In this case, Southside has two roles: one as a jobber to independent stations, and one as the owner of a string of its own stations. With regard to the independent stations, Southside had separate contracts that required the owners to sell gas under the BP brand. Southside has similar arrangements with other refiners (principally Exxon) and independent stations.

[2] Section 12(f) of the contract actually calls the ROFR a "Right to Purchase."

The 2010 BJC expired by its own terms on October 2, 2013. During negotiations to renew that contract, BP sent – by its account, merely to fulfill a pro forma legal requirement – a "notice of non-renewal," reaffirming to Southside that if the parties failed to reach a new deal by October 2, 2013, the parties' relationship would end. On October 2, 2013, Southside sent BP a letter stating that Southside did not agree to BP's proposed terms, and declining to renew the 2010 BJC. The contractual relationship thus ended.

Previously, however, an affiliate of Sunoco, ETC M-A Acquisition LLC ("ETC"), reached an agreement to indirectly purchase Southside in its entirety. A company named Mid-Atlantic Convenience Stores, LLC ("Mid-Atlantic") owned Southside. Another company named MACS Holdings, LLC was the parent company and sole owner of Mid-Atlantic. ETC agreed to buy all of Mid-Atlantic, which meant that Southside fell completely within the control of ETC. In other words, ETC bought Mid-Atlantic and automatically took ownership and control of Mid-Atlantic's wholly owned subsidiary, Southside.

ETC and MACS Holdings signed that contract – the Membership Interest Purchase Agreement ("MIPA") – on August 1, 2013. The contract, however, included the term that the deal would not *close* before October 4, 2013. Between August 1 and October 2, Southside continued to negotiate with BP on the terms of a renewed BJC, although it clearly had no intention of reaching a deal with BP. On October 2, 2013, the 2010 BJC between Southside and BP expired. On October 4, 2013, Sunoco issued a press release noting the acquisition of Mid-Atlantic (and therefore Southside) by an "affiliate" of Sunoco's. Blindsided by Southside's actions, BP smelled a rat, and filed suit on October 22, 2013, invoking the Court's diversity jurisdiction.

Since the October 4, 2013 closing, Southside has rebranded all but two of its thirty-five former BP stations.

## II. Proceedings

BP's complaint contains five counts. The first two counts raise breach of contract claims against Southside (for specific performance and, alternatively, damages); Count III sets forth a claim of ejectment against Sunoco, seeking to remove Sunoco from any of the assets related to the 2010 BP-Southside contract. Count IV, brought against both defendants, seeks a declaratory judgment to declare the 2013 contract between Southside and Sunoco null and void. Count V seeks an injunction against both defendants, enjoining the further re-branding of Southside's gas stations from BP to Sunoco.

BP's motion for a preliminary injunction arises from Count V and seeks to prevent further rebranding. In its motion, BP relies upon two of its contractual rights in the 2010 BJC: the ROFO, found in §12(a), and the ROFR, found in §12(f), as modified by the side letter agreement. BP freely admits that at the time it filed its Motion, it was unsure not only of the contents of the MIPA but also of the extent to which Southside and Sunoco had already re-branded Southside's stations from BP's brand to Sunoco's. Now, the parties agree that only two BP stations have not been rebranded. BP now seeks only to enjoin the re-branding of those two Southside stations.

## III. Standard of Review

A preliminary injunction is appropriate when the plaintiff establishes that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the plaintiff's favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *Real Truth About Obama,*

*Inc. v. Fed. Election Comm'n,* 575 F.3d 342, 346–47 (4th Cir. 2009), *vacated on other grounds,* 130 S. Ct. 2371 (2010). As the Fourth Circuit noted in *Real Truth, Winter* requires that a plaintiff make a clear showing that he will likely succeed on the merits at trial. *Real Truth,* 575 F.3d at 346. Moreover, "[a] preliminary injunction is an extraordinary remedy, which may be awarded only upon a clear showing that a plaintiff is entitled to such relief." *Scott v. Bierman,* No. 10–1483, 2011 WL 1807330, at *3 (4th Cir. May 12, 2011) (citation omitted).

## IV. Discussion

The evidence before the Court indicates that Southside and Sunoco acted disingenuously in concealing the purchase of Southside, while continuing to carry on fake negotiations with BP. To succeed in its motion, however, BP needs more than proof of the defendants' poor behavior. Rather, BP must make a "clear showing" as to each of the four *Winter* factors. BP's motion falls short on several fronts.

The first *Winter* factor requires BP to prove that it is likely to prevail at trial; the evidence in the record does not clearly satisfy the elements required by Virginia contract law. The "irreparable harm" BP alleges, while plausible in relation to the (already realized) loss of 33 stations, has already occurred. The branding status of the *two* stations at issue, by itself, does not approach the threshold of "irreparable" harm. Finally, a consideration of *Winter*'s third and fourth factors, the "balance of the equities" and the public interest, equates at best to essentially a break-even proposition between the parties. Accordingly, the Court must deny BP's motion.

### A. Likelihood of Success on the Merits

BP's complaint alleges a breach of contract claim. To satisfy *Winter*'s "likelihood of success at trial" prong, BP must clearly satisfy each of the three elements of a breach of contract under Virginia law: "(1) a legally enforceable obligation, (2) the defendant's material breach of

that obligation, and (3) damage to the plaintiff caused by the breach of that obligation." *Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1076, 1086 (E.D. Va. 2011) (citing *Filak v. George*, 267 Va. 612, 594 S.E.2d 610, 614 (2004)).

The defendants do not dispute that BP can satisfy the first and third elements: the 2010 BJC bound the signatories (to include, of course, Southside) by its terms, and BP has suffered some sort of injury from the rebranding. Whether Southside actually breached the contract, however, raises meatier questions. As to the Right of First Refusal, BP is on shaky ground. The sale of Southside to ETC did not occur until after the contract expired. Counsel for BP admitted that it is not unusual for gas stations and jobbers to change gasoline brands. Typically, when a jobber or gas station changes brands, it has already made arrangements to change to a new brand, so Southside's negotiations should not have surprised BP, particularly since BP had formally notified Southside that it would no longer supply gasoline after October 2, 2013. Lining up a new supplier before the end of the contract, therefore, appears to be par for the course in the gasoline business, and BP can hardly argue that its cut-off letter means nothing. The 2010 contract does not say *when* Southside must offer a right of first refusal for BP, but surely it must come during the term of the contract, but BP's right to purchase ends with the contract—in this case on October 2, 2013, two days before the sale of Southside. In short, substantial questions exist as to BP's right to exercise its ROFR.

Turning to the Right of First Offer, the plaintiff falters again. First, the Court has some doubt that the ROFO even applies here. The ROFO arises from a paragraph that deals with asset sales and envisions the sale and purchase of *some* of Southside's assets. The paragraph establishing a ROFR, in contrast, is contained in a paragraph dealing with the sale of *all* assets— which is what Southside is doing here. Under the maxim expressio unius est exclusio alterius, a

substantial argument can be made that BP had no ROFO here. *See Smith Barney, Inc. v. Critical Health Systems of NC*, 212 F.3d 858, 861 (4th Cir. 2000) (maxim applied in interpreting forum selection clause in contact).

In any event, the ROFO simply opens negotiations between BP and Southside. It does not preclude Southside from negotiating with other potential purchasers, and it certainly guarantees no agreement for BP to buy the assets. While Southside may have breached the ROFO provision, its breach does not assure any relief to BP.

In short, the Court has questions about how likely BP is to win on the merits. Perhaps BP will eventually carry the day. But at this time, BP has not made the required showing of a strong likelihood of success on the merits.

### B. Irreparable Harm

BP also has not satisfied the requirement of showing irreparable harm. BP must clearly demonstrate that Southside's breach actually and proximately caused BP to suffer an injury. *See Saks Fifth Ave., Inc. v. James, Ltd.*, 272 Va. 177, 630 S.E.2d 304, 311 (2006). BP's asserted "damages," by its own admission, are inherently speculative. Southside's inequitable actions, no matter how egregious or premature, can only be said to have "harmed" BP if BP can show that it would have purchased Southside's assets.

The breach of the duty to offer a ROFO (if one exists here) does not create irreparable harm. The ROFO at best merely opened talks between Southside and BP. Nothing in the ROFO assured BP that it could purchase any assets, to say nothing of a string of BP stations.

If BP suffered irreparable harm, the harm arose from the Right of First Refusal, which would offer BP a right to buy *all* of Southside's petroleum operations. BP proffers only a hypothetical injury, its materialization contingent on intervening factors: that subject to a review

of the MIPA, subsequent internal corporate deliberations, due consideration of the prevailing market conditions, and undoubtedly many other factors, BP *might* choose to purchase Southside. Given that BP had sold its stations to Southside because it decided to go out of the gas station business, it seems very unlikely that BP would have purchased Southside's entire petroleum operation. "Issuing a preliminary injunction based only on a *possibility* of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (emphasis added) (citation omitted). The law requires more than BP can prove.

Further, given that only two BP stations remain under Southside's control, any injury does not add up to the irreparable harm claimed by BP. BP notes that the sale of Southside effectively killed its brand presence in some 35 gas stations in Virginia in one fell swoop, resulting in a sizeable diminishment of BP's market presence, fuel revenues, and (perhaps) customer loyalty. BP argues, probably correctly, that the sum total of those harms defies simple monetary compensation. BP's motion, however, asks the Court to close the barn door after the herd has already run off, citing as justification its concern that failing to do so will permit the herd to escape. BP's Southside-controlled stations are gone. The harms attendant to that loss, if any, have already occurred. Keeping the two surviving stations branded BP will neither avert any pending harm, nor alleviate a realized one.

"Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, at 22 (emphasis in original). BP's motion looks backwards; the law requires the Court to do the opposite. BP is not likely to suffer irreparable harm in the event that Southside rebrands the two remaining stations at issue, and so its motion must be denied.

### C. Balance of the Equities and Public Interest

The same rationale applies when considering the third *Winter* factor, which courts frequently characterize as a blended review of both the respective "hardships" that a grant (or denial) of an injunction would visit on the parties, and the weightiness of the interests the parties assert are at stake. *See Winter*, at 378-82; *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). The Court's decision to permit or deny the planned re-branding of the two BP-branded stations at issue, viewed in light of the parties' respective interests in those stations, equates at best to a break-even proposition. Sunoco's footprint in the Richmond metro area would rise by two stations, or remain the same; BP's presence would remain the same, or fall by two. Neither result would subject Richmonders to the "consumer whiplash" both parties allege, nor irrevocably harden the public's feelings for or against either company. BP must make a "clear showing" that the equities favor its motion; because the Court sees little tangible distinction between the parties' interests, the balance does not tip toward BP.

For the same reason, BP cannot show that the public interest lies in its favor. The presence or absence of two service stations of a particular brand simply does not affect the public interest. Most consumers probably do not care at all about the gas sold at the last two stations.

## V. CONCLUSION

For the reasons set forth above, the Court DENIES the plaintiff's motion for a preliminary injunction.

The Court will enter an appropriate order.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

Date: December 10, 2013
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge